UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUDHIR KUMAR,

                    Plaintiff,

          v.

THE ACCREDITATION COUNCIL FOR
GRADUATE MEDICAL EDUCATION,

                    Defendant.

No. 21 CV 2822

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Sudhir Kumar worked as a software developer at the Accreditation Council for Graduate Medical Education for seven years until he became so frustrated that he began speaking up about what he perceived to be discrimination against developers generally and against himself as an Asian of Indian national origin. Kumar was eventually fired and brings this case claiming that he was subject to racial and national origin discrimination and was terminated in retaliation for making his complaints. But Kumar fails to show that he was treated differently because of his race or national origin; he also fails to show that the non-discriminatory rationale for his termination—his insubordinate behavior—was pretextual. As such, summary judgment is appropriate for defendant on all claims.

I.    **Legal Standard**

Summary judgment is warranted if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020). A court need consider only

the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The court should give the non-moving party "the benefit of conflicting evidence and any favorable inferences that are reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022). "The substantive law of the dispute determines which facts are material" and a genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Id. citing Lord*, 952 F.3d at 903.

A. **Local Rule 56.1 Statements of Fact**

Local Rule 56.1 sets out the procedure for parties to introduce and dispute facts at summary judgment. The non-movant should respond to the movant's statement of facts by either disputing or admitting the facts, and if he desires, assert additional facts in a separate 56.1 statement. N.D. Ill. Local R. 56(b)(2)–(3), (d)(1)–(e)(3). Only "fairly responsive" facts are supposed to be included in the response to a 56.1 statement. N.D. Ill. Local R. 56(e)(2). I apply an expansive interpretation of "responsive" to consider some of the facts that Kumar asserts in his response to defendant's 56.1 statements and nowhere else. Such a decision is within my discretion. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632–33 (7th Cir. 2009) ("[T]he district court must apply Rule 56.1 in the specific context of the litigation before it and determine whether the submission at issue adequately complies with the purpose and intent of the Rule or impedes that Rule's effectiveness."). I disregard legal arguments and statements unsupported by the record or supported by evidence

2

that would be inadmissible at trial, such as hearsay. *See* N.D. Ill. Local R. 56(d)(4); *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

## II.    Facts

The Accreditation Council for Graduate Medical Education is an Illinois non-profit organization that accredits medical residency and fellowship programs in the United States. [36] ¶ 2[1]; *About Us*, Accreditation Council for Graduate Med. Educ., https://www.acgme.org/about-us/overview/(last visited Dec. 15, 2022). Sudhir Kumar was a software developer at the Council in its Department of Applications and Data Analysis from 2012 until he was fired on January 31, 2020. [36] ¶ 1; [42] ¶ 23. While Kumar was at the Council, his direct supervisor was Steven Nash, the head of the Application Development team. [36] ¶ 6. Nash reported to Rebecca Miller, who was the Senior Vice President of Applications and Data Analysis and oversaw the entire department, including a Quality Assurance group. [36] ¶ 7. Kumar was expected to cooperate and work daily with the Quality Assurance group. [36] ¶ 9.

### A.    Raises

Plaintiff received an annual salary increase every year he was employed by the defendant, as did all other employees reporting to Nash. [36] ¶¶ 12–13. The amount of the raises differed from employee to employee. [36] ¶ 13.[2] Each year Human

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Kumar's response to defendant's Local Rule 56.1 statement, [36], and defendant's response to Kumar's 56.1 statement of additional facts, [42], where both the asserted fact and the opposing party's response are set forth in one document.

[2] Plaintiff disputes paragraph 13 "as to the difference of the amount among other white employees." [36] ¶ 13. The cited support for this dispute is Kumar's deposition testimony that

Resources would give Miller a pool of money to use for the annual raises; Miller would discuss raises with individual managers and then she would make the final decision as to how to distribute the money for the annual raises. [36] ¶ 14. Miller testified that there would only be a large discrepancy in raises when an employee was promoted or the Council wanted to standardize salaries. [36] ¶ 15.[3] In January 2020, there were four permanent employees in Nash's department. *See* [36] ¶ 16; [28]. Kumar got the lowest raise percentage of 1.5%. [36] ¶ 16. A colleague who was Asian, a Filipino-American, and worked as a Technical Lead received a 2.0% raise. *Id*. Two colleagues received a 2.01% raise—one of them was white who was also a Technical Lead and the other was Asian, Indian-American, and a developer like Kumar. *Id*. Miller stated that Kumar's under-performance in 2019 was the reason for him receiving the lowest raise, but she did not remember the specific conversation she had with Nash about Kumar's raise for 2020. [36] ¶ 17; [38-2] at 38:15–39:12.

**B.  Promotions**

Nash would initiate a promotion within his group by making a recommendation to Miller. [36] ¶ 18.  If Miller agreed with the recommendation, she would work with Human Resources to formalize the promotion. *Id*. There is no evidence in the record about whether employees had to apply in order to be considered for a promotion and the parties disagree on the very definition of "promotion." Miller

---

he did not receive the same amount in salary increase as other employees of a different race or national origin. [38-1] at 88:5–21. This does not controvert the fact that the amount of annual raise varied among employees and that fact is deemed admitted.

[3] Plaintiff disputes paragraph 15 but does not provide a basis for his dispute. [36] ¶ 15. A general dispute is not sufficient to controvert paragraph 15 and it is deemed admitted.

described changes in position at the Council as "title changes just recognizing the current work they were doing." [27-3] at 29:23–30:1; [36] ¶ 21. Kumar argues that these title changes were actually promotions that occurred without the position being posted. [36] ¶ 21. The evidence reflects that Council employees changed positions with corresponding changes in pay. [27-3] at 29:23–31:11; 40:11–41:20. While at the Council, Kumar did not apply for any internal positions. [36] ¶ 19.[4] In 2019 and 2020, no positions were created or opened into which Kumar believed he should have been promoted. [36] ¶ 20.[5] In Miller's department, three Project Managers were promoted to Senior Project Managers in 2019, three Directors were promoted to Senior Director in 2020, and one Manager in data analytics was promoted to Director. [36] ¶¶ 22, 32; [27-3] at 30:2–31:11.

The next most senior position available to developers like Kumar was the position of Technical Lead. [36] ¶ 23.[6] A Technical Lead was responsible for a specific software product; there were three such software products in Nash's department. [36] ¶ 25. In 2016, two of Kumar's colleagues were promoted to Technical Lead. [36] ¶ 24.

---

[4] Plaintiff disputes this as a misrepresentation of his deposition testimony, [36] ¶ 19, but plaintiff did testify that he did not apply for an internal position while at the Council. [27-1] at 58:14–16. Paragraph 19 is not controverted and is deemed admitted.

[5] Plaintiff disputes this on the basis that there were promotions in Nash's group during Kumar's tenure. [36] ¶ 20. The portion of Nash's testimony to which he cites, however, is about the promotions to Technical Lead that occurred in 2016, not 2019 or 2020. *See* [38-4] at 50:13–17; [36] ¶ 24. The record supports the conclusion that there were promotions in Nash's group, but that they occurred in 2016. As such, the facts in paragraph 20 are not controverted and are deemed admitted.

[6] Plaintiff disputes this on the basis that Nash was promoted from developer to Director. [36] ¶ 23. The cited portion of the record does not support that assertion. *See* [38-1] at 74:12–17. Paragraph 23 is deemed admitted.

An independent contractor for the Council was also promoted to Technical Lead in 2016. *Id*. No other individuals were made Technical Lead in Nash's department during Kumar's tenure. [36] ¶ 25. The position of Technical Lead required that the developer be proficient in multiple technologies and have strong interpersonal skills to mentor other developers in the technologies. [36] ¶ 26. Nash did not believe that Kumar, at least in 2019, had the requisite broad technical knowledge and interpersonal skills for this position. [36] ¶ 27.[7] Other possible positions for Kumar to move into would have been a Project Manager or Director position, neither of which were a natural progression from the developer position; Kumar did not pursue either position. [36] ¶¶ 28–30.[8] Historically there had not been both a Director and Senior Director in the same department; during Kumar's employment Nash was either the Director or Senior Director of Application Development. [36] ¶ 31.

## C.    Other Discrimination and Reports

Kumar perceived a difference in how non-white developers were granted leave to work from home and attended company-wide town hall meetings, and whether

---

[7] Plaintiff disputes paragraph 27 because his 2018 Performance Review "outlined he had the requisite experience and skillset." [36] ¶ 27; [38-8]. The 2018 Performance Review does show that Nash rated Kumar as "exceeds expectations" in interpersonal skills and that Kumar met or exceeded expectations in "managing technology", "problem solving/analysis", "quality." [38-8] at 3–4. Paragraph 27 is controverted as to Nash's belief about Kumar's skills in 2018 and I've noted that it is Nash's belief as of 2019.

[8] Plaintiff disputes paragraphs 28 and 29 of defendant's Rule 56.1 statement on the basis that he didn't apply to positions because none were posted and that he was qualified to be a project manager because of his 2018 performance review. [36] ¶¶ 28–29. Kumar does not actually assert that he would have applied for a *product manager* position, and I address his general complaint about the lack of posted positions in the analysis section below. Kumar's 2018 performance review for his work as a developer does not establish his eligibility for a project manager position. With the caveat about internal positions not being posted, paragraphs 28 and 29 are deemed admitted.

non-white employees were given credit for their work. [36] ¶ 10. Defendant had no regular work from home policy; usually work-from-home decisions were made ad-hoc and Nash testified that he tried to be flexible with employees. [36] ¶ 33.[9] All employees could ask to work from home on occasion and Nash does not remember ever denying a request from Kumar to work from home. [36] ¶ 34.[10] In his written complaint of discrimination, Kumar emphasized that white employees in his group were regularly allowed to work from home, but that non-white developers were not allowed to work from home. [27-15] at 3. He included a list of dates on which white employees were allowed to work from home. [27-15] at 16. The only example of a non-white employee not being allowed to work from home was from July 2019 when Kumar asked to work from home to take care of a sick relative and was told to take the time off. *Id.* In his deposition, Kumar clarified that he could and did work at home on nights and weekends, that he preferred to work in the office so he could interact with others, and that his complaint was about not having the flexibility to work from home in emergency situations. [36] ¶ 35[11]; [27-1] at 48:12–50:2.

---

[9] Plaintiff disputes this on the basis that non-white employees were not extended the same courtesy as white employees were. [36] ¶ 33. To support his dispute, Plaintiff points to the examples of T, who was allowed to work from Australia, and CY, who was allowed to work permanently from Florida. *Id.* This does not directly controvert the asserted facts that there was no set work-from-home policy and that Nash tried to be flexible with his employees. Paragraph 33 is deemed admitted.

[10] Plaintiff disputes paragraph 34 on the same basis as paragraph 33, above. [36] ¶ 34. The facts that two white employees were allowed to work from Australia and Florida does not directly controvert the asserted facts that all employees could ask to work from home or that Nash could not remember denying a request from Kumar to work from home. Paragraph 34 is deemed admitted.

[11] Plaintiff disputes paragraph 35 as a misrepresentation of his testimony. [36] ¶ 35. I agree that the deposition transcript shows that Kumar testified there was no effect on his

Kumar also felt that he and other developers were discouraged from attending the company-wide town hall meetings, although he did attend some town hall meetings during his employment. [36] ¶ 36; [38-1] at 113:19–21. Nash did not recall ever discouraging any employee from attending the town-hall meetings; Miller testified that no one was discouraged from attending the meetings. [36] ¶ 37. In his deposition, Kumar testified that Nash told all of the Council developers that a better use of their time was to work and if anything important was mentioned at the town hall, Nash and Miller would tell them. [27-1] at 114:11–22. Viewing the facts in Kumar's favor, Nash's comment could be understood to be discouraging attendance.

Kumar believed that his work and the work of other non-white developers was often credited to others, specifically to white employees, resulting in a pattern where developers of color were excluded from upper management. [36] ¶ 38; [27-15] at 3–4. Kumar, in his deposition and formal complaint, gave specific examples of work he did for which he believed others received credit. *See* [27-1] at 88:16–92:7; [27-15] at 4–5. Much of the work that Kumar referenced occurred before 2019, although he discussed the migration of data from the American Osteopathic Association that occurred through 2019 and his general efficiency in "closing defects or tasks." [27-1] at 90:22–92:7; [36] ¶ 38.[12] Kumar felt if he had been given credit for his work it would have

employment as far as his ability to do his job, but there was an effect on his employment in terms of being afforded the flexibility to deal with emergencies. *See* [27-1] at 49:4–20.

[12] Plaintiff disputes paragraph 38 on the basis that his allegations of "exclusion" occurred through his termination. [36] ¶ 38. Plaintiff cites to an email to HR with photos from a social outing to support his dispute, but at most they show an alleged separation of white and non-white employees (and that is making assumptions about the employees' races and ethnicities based solely on their appearance). Furthermore, physical exclusion or separation from upper management is a different claim than lack of credit for work. The portion of Kumar's

been "a pat on the back. It's a recognition." [36] ¶ 39; [27-1] at 100:13–17. Kumar believed that recognition would have helped him get a promotion but did not have a more robust explanation of why that was so. [36] ¶ 39; [27-1] at 100:19–101:13.

Kumar brought his concerns about disparate treatment to the attention of John Ogunkeye, defendant's Chief Financial Officer and Executive Vice President in June 2019. [42] ¶ 1. Ogunkeye and Kumar have different memories about what happened in this first meeting and even how many times they met in June 2019; for purposes of summary judgment, I rely on plaintiff's version.[13] On June 3, 2019, Kumar typed up a "complaint" and gave it to Ogunkeye and told Ogunkeye that he needed all of "these things" to stop and that "we are treated better. Not differently." [27-1] at 115:1–115:20. Ogunkeye took the complaint and Kumar understood that Ogunkeye was going to speak with the CEO. [27-1] at 115:20–24. After a few days, Ogunkeye came back to Kumar and told him that there was not much they could do because Kumar did not want his name on the complaint and that the organization was planning on conducting a survey on diversity and racial equality. [27-1] at 115:24–116:8. Ogunkeye told Kumar that the organization was going to look into the matter and make changes. [27-1] at 116:8–12.

---

deposition cited to by defendant in paragraph 38, however, supports that Kumar did not get credit for his work up and until his termination—Kumar testified about the data migration project that went into 2019. [27-1] at 90:22–92:7.

[13] Because each side disputes almost every single statement of fact the other makes about the events in June 2019, *see* [36] ¶¶ 69–71 and [42] ¶¶ 1–3, I rely on the deposition transcript.

On Friday, September 20, 2019, Kumar sent Ogunkeye an email with the subject line, "Complaint of Racial Discrimination." [27-15] at 2; [36] ¶ 72; [42] ¶ 4.[14] The complaint was a list of the ways in which Kumar felt that he and "other people of color" were discriminated against, including: not being able to work from home, not being promoted, their work and efforts being portrayed as others' achievements, being given a standard raise of 2 to 3%, lack of exposure to senior management, systematic exclusion of non-white employees, and preferential treatment of those who Kumar termed as "inside the circle of trust" of Miller, who he believed were all white and born in the United States. [27-15] at 3–5.

Ogunkeye and Kumar met the following Monday and discussed the complaint. [36] ¶ 73. Ogunkeye and Kumar agreed that the outcome of the meeting was to wait for the new Chief Information Officer. [36] ¶ 74[15]; [42] ¶ 13. Specifically, Kumar testified that Ogunkeye told him that he was sorry for "not responding" and that the Council was "going to have a new CIO—already had a CIO, and that as part of that [defendant] would make changes." [27-1] at 152:3–8; [36] ¶ 75.[16]

---

[14] Defendant disputes paragraph 4 on the basis that the record does not support that Kumar made complaints of discrimination on June 24, 2019, or on January 2, 2020. [42] ¶ 4. The record supports that Kumar made at least one verbal complaint of racial discrimination in June 2019, one written complaint of racial discrimination in September 2019, and one written complaint of retaliation in January 2020. All other allegations in paragraph 4 are struck.

[15] Plaintiff disputes paragraph 74 on the basis that Ogunkeye testified that Kumar had a specific plan of action he wanted Ogunkeye to take, presumably seeking to controvert the assertion that Ogunekeye and Kumar agreed to wait for the new CIO. [36] ¶ 74. Both Ogunekeye and Kumar testified that they agreed to wait until there was a new CIO. [27-10] at 62:6–8; [27-1] at 152:3–11. Paragraph 74 is not controverted and deemed admitted.

[16] Plaintiff disputes paragraph 75 but does not describe the basis for his dispute, instead just including more facts about Kumar's email in January 2020. [36] ¶ 75. Paragraph 75 is not controverted and deemed admitted.

At some point in time Ogunkeye told Richard Murphy, the Vice President of Human Resources, about Kumar's complaint that "he wasn't being treated fairly compared to other people." [42] ¶ 6[17]; [38-3] at 46:18–48:12. Murphy testified that he relied on Ogunkeye to investigate Kumar's complaints. [42] ¶ 12. Murphy believed that Ogunkeye had reviewed Kumar's documents and concluded that there was no evidence of discrimination. [42] ¶ 18; [38-5] at 20:1–6. Ogunkeye also spoke with the Council's Chief of Staff and relayed Kumar's issues. [27-10] at 49:1–16; [42] ¶ 9.[18]

Kumar made a complaint of retaliation to Ogunkeye via email on January 2, 2020, and attached a copy of his 2019 performance review. [42] ¶ 19; [38-12]. Kumar wrote that "any criticism or comments about people inside [Miller]'s circle of trust, is met with collective and organized retaliation from them." [38-12] at 3.[19] Kumar wrote that he felt he could not bring up issues with Business/QA managers because Nash had dissuaded him from doing so. *Id.* Kumar complained of being isolated by Miller and the head of QA. [42] ¶ 21. Ogunkeye replied that he would share Kumar's concerns with the HR department and he recommended that Kumar "await the

---

[17] Defendant disputes paragraph 6 on the basis that Ogunkeye was "limited" in what he told Murphy about Kumar's complaint. [42] ¶ 6. The fact that Ogunkeye was limited in what he shared does not directly contradict the asserted fact that Ogunkeye shared Kumar's complaints with Murphy and paragraph 6 is deemed admitted.

[18] The parties dispute whether Ogunkeye told the Chief of Staff about Kumar's "complaints of discrimination" or described the issues as perceived "unfairness." [42] ¶ 9.

[19] Paragraph 20 of Kumar's Rule 56.1 Statement of Additional Facts states that his complaint of retaliation was directed to Nash, Miller, Murphy and members of the QA team. [42] ¶ 20. Defendant disputes the paragraph because Plaintiff only cites to his 2019 performance review as support. I agree. The performance review does not support facts about who Kumar thought was retaliating against him. I have relied on the text of Kumar's January 2, 2020 email, as it is cited to by both defendant and plaintiff in their 56.1 Statements of Facts, to define Kumar's retaliation complaint.

11

arrival of the CIO" because "he will be in a position to assess, first[]hand, your grievances and respond accordingly." [38-12] at 2–3; [42] ¶ 16.[20] Kumar agreed to wait for the CIO "to make his own decisions regarding all [of] this." [38-12] at 2.

Kumar did not make complaints of discrimination directly to Nash or to Miller and he does not know whether anyone he contacted regarding his complaints of discrimination ever informed Nash or Miller of the complaints of discrimination. [36] ¶ 78. Neither Nash nor Miller knew that Kumar had made internal complaints of racial and national-origin discrimination until after he was terminated. [36] ¶ 79.[21] Miller knew that Kumar was unhappy with how their department operated and that

---

[20] Defendant disputes paragraph 16 on the basis that the record citation does not support the assertion that Ogunkeye was going to share Kumar's complaints of racial discrimination with the new CIO. [42] ¶ 16. But the email from Ogunkeye states "I will share this communication with him and apprise him of our previous discussions." [38-12] at 3. While I agree that "this communication" refers to Kumar's January 2nd email (which does not mention racial discrimination), the phrase "previous discussions" suggests that Ogunkeye would share the larger context of Kumar's complaints, including those of racial and national-origin discrimination.

[21] Plaintiff disputes paragraph 79 on the basis that Miller admitted she knew Kumar wanted a change in leadership and that a colleague, E.F., had told Kumar he would tell Nash about Kumar's complaints of discrimination. [36] ¶ 79. First, knowing that Kumar wanted a change in leadership is different than knowing that Kumar believed Miller was discriminating against him on the basis of race and national origin, so the paragraph is not controverted as to Miller's knowledge. Second, as discussed in note 22 below, Kumar's testimony about E.F. telling Nash of the complaints of discrimination is hearsay and does not establish Nash's knowledge of Kumar's complaints. Paragraph 79 is deemed admitted.

he wanted to express his critiques to the incoming CIO. [42] ¶ 7.[22] Ogunkeye provided

a brief overview of Kumar's complaints to the new CIO in January 2020. [42] ¶ 17.[23]

### D. Performance Issues and Termination

In 2018, Kumar had a very positive performance review; he met or exceeded

expectations in all the categories. [42] ¶ 25. Nash commented: "Thank you for all you

contribute … Your contributions to our team are appreciated." [42] ¶26. Prior to 2019,

Nash never disciplined Kumar in writing; Nash did not have a formal procedure for

handling discipline. [42] ¶ 24. In 2019, however, Nash began to have concerns about

Kumar's interactions with others at the Council, including those who worked in the

Quality Assurance department, with whom Kumar had to cooperate to do his job. [36]

¶¶ 40, 9.

---

[22] Defendant partially disputes paragraph 7 on the basis that while Miller knew Kumar had general complaints about the Council, she did not know that Kumar's complaints were of racial and national origin discrimination. [42] ¶ 7. I agree that the record supports that Miller was not aware that Kumar believed she or anyone at the Council was acting in a racially discriminatory manner. The facts as stated above reflect that distinction. Defendant successfully controverts paragraph 8 of plaintiff's 56.1 statement of additional facts on the basis of hearsay and lack of foundation. [42] ¶ 8. Kumar's testimony, "I think Earle was going and telling Steve as to what was going on about the conversation," *see* [38-1] at 240:24–241:2, is hearsay (if based on an out-of-court statement from E.F. advising Kumar about the content of a communication with Nash) and lacks adequate foundation ("I think"). Paragraph 8 is struck. There is no competent evidence that Nash knew of Kumar's complaints of racial and national-origin discrimination.

[23] Defendant disputes paragraph 17 on the basis that the cited portion of the record doesn't support the assertion that Ogunkeye mentioned "complaints." [42] ¶ 17. While it is true that the portion of Ogunkeye's deposition transcript cited by Kumar doesn't contain the word "complaint," the portion of the record cited by defendant contains the testimony "I contextualized that we have someone that's disaffected with the department, thinking they're being treated unfairly…" [38-3 at 85:8–10]. The record supports the general assertion that Ogunkeye gave a brief overview of Kumar's complaints to the new CIO as is stated above.

Nash identified a number of areas where he felt that Kumar needed to improve in Kumar's 2019 performance review. [36] ¶ 41. Nash advised Kumar to "try and avoid sounding like you're lecturing QA or listing companies you've worked for that doesn't go over well … People feel like they're being talked down to." [27-11] at 3; [36] ¶ 42. Kumar responded in writing, "the majority of the Business/QA staff have never worked in another company in software development, they are not aware of these processes and documentation standards and may foresee as me putting them down rather than taking it as informative and an opportunity to learn." [27-11] at 8; [36] ¶ 43. Kumar testified that he did tell QA employees the other companies he had worked for and that the standards for documentation in software development were different at the Council than at companies whose main product was software development. [36] ¶ 44; [27-1] at 173:13–174:9. Kumar also believed Nash was being honest when he told Kumar that other employees felt they were being talked down to by Kumar. [36] ¶ 44; [27-1] at 174:15–23.

Nash rated Kumar as "needs development" in "Teamwork" and stated that others at the Council were tired of Kumar's discussion about who the new CIO would be. [36] ¶ 45; [27-11] at 3. Kumar admitted that he was discussing the potential new CIO with other developers and QA staff and that he does not doubt Nash received this feedback from other staff. [36] ¶ 46. Nash highlighted that Kumar needed to improve how he worked with the QA team by being more conscious of their time and gave several specific suggestions on how to do so. [36] ¶ 47.

Nash also rated Kumar as "needs development" on his Interpersonal Skills and advised Kumar to: "try to not sound like you're lecturing people … avoid listing your experience to people … avoid telling QA people things like your job is to test the hotfix branch as well as the release branch." [36] ¶ 50; [27-11] at 4. Nash warned Kumar that "talking negatively about [the director and manager of the QA team] in front of their staff or other QA people has gotten around and I've had to hear about it." *Id.* Kumar responded by writing in his review, "me talking negative about some people in Business/QA is their short comings in knowledge and also about lack of proper efforts on their part to do the job and then we have to pick up the pieces for them" and that he told some "junior QA members as to what their responsibilities are and what is expected of them so I can do my job." [27-11] at 8; [36] ¶ 51.

As part of his written response in the 2019 review, Kumar referred to an incident with AW, a Quality Assurance employee, where she "blindly told me that she couldn't support the task she wrote, as she is busy." [36] ¶ 48; [27-11] at 8. Kumar responded by telling AW, "You know, this is your job, this is my job. I can't do it without writing." [27-1] at 184:5–7. Kumar heard from others that AW had cried about the incident, but he did not hear or see her crying. [36] ¶ 48; [27-1] at 183:16–19.  AW discussed the interaction with Kumar with her boss, the head of QA, and she became emotional during the conversation. [36] ¶ 49. The head of QA, in turn, told Nash that he believed that Kumar had made AW uncomfortable and that AW had cried while discussing the incident. *Id.*[24]

---

[24] Plaintiff disputes paragraph 49 on the basis that Kumar believed AW cried because she was in a bad mood due to other life concerns. [36] ¶ 49. That assertion does not controvert

Kumar and Nash met on January 3, 2020, to discuss Kumar's 2019 Performance Review and Nash took notes from the meeting. [36] ¶ 53. Nash wrote that he had explained to Kumar that his treatment of others had become problematic and Nash wanted to work with him to "find ways to not come across as abrasive, and to foster team relationships." [36] ¶ 54; [27-12]. Nash wrote that Kumar was not open to this feedback and that "he expressed that he has become more vocal on purpose, and that things would be much better once the new CIO arrives because he comes from a software background and will be very focused on processes." *Id*. Nash concluded that Kumar "accept[ed] no responsibility for making people avoid him, cry after conversations with him, etc." *Id*. Nash thought that the conversation was "pretty heated." [36] ¶ 56. He had expected Kumar to express remorse and take responsibility for his behavior, instead Nash perceived that Kumar did not show any "willingness to change at all" or to accept constructive feedback. [36] ¶¶ 56–57.[25] Kumar admitted that during the meeting he said the words, "Don't worry. They can't touch me." [36] ¶ 55. Kumar argues that he was responding to a perceived threat, specifically that Nash said, "[I]f they had complained to HR, there might be bad consequences. I don't

---

the head of QA's observation of AW's demeanor during their conversation about the incident with Kumar or the fact that the head of QA reported his observation to Nash. Paragraph 49 is not controverted and is deemed admitted.

[25] Plaintiff disputes paragraph 57 without providing a specific basis for his dispute and instead lists additional facts about his performance review. [36] ¶ 57. The cited portion of the record—Nash's notes and his deposition—reflect Nash's perception that Kumar did not take responsibility for the effect of his actions on others. Paragraph 57 is therefore deemed admitted. Additional facts that are not fairly responsive to the paragraph are disregarded. N.D. Ill. Local R. 56.1(e)(2).

want to lose you," which Kumar took as a threat to his job. [27-1] at 210:11–16. Kumar did not change his behavior after the January 3, 2020 meeting with Nash. [36] ¶ 58.

Nash was also worried by Kumar's behavior during an incident on January 17, 2020. Kumar was using a vacant office to make a personal phone call while Nash and Miller were having a meeting next door. [36] ¶ 59.[26] Nash remembers that Kumar was "shouting and yelling." *Id*. Kumar was speaking to his mother on the phone and said that he would not know if he was talking loudly. [36] ¶ 59; [27-1] at 217:16–22. Although Miller does not remember talking to Kumar about his volume, Nash recounted in a later email that she "pulled [Kumar] aside because he was in there talking loudly and [told him] to go somewhere else." [42] ¶ 29[27]; [36] ¶ 61[28]; [27-13]. Kumar testified that Miller told him to "get back to work" and to use the copy room for his phone call and not to use the vacant office. [27-1] at 216:16–217:5. Kumar then

---

[26] Plaintiff disputes paragraph 59 primarily on the basis that Miller did not remember the incident when asked about it at her deposition. [36] ¶ 59. I agree that Miller's inability to remember the incident means there is no support for facts about the incident from Miller's perspective. Both Kumar and Nash, however, remember the incident and were able to testify about it extensively and Nash provided a foundation regarding his email to HR describing the incident. *See* [27-1] at 216:9–220:11 and [27-2] at 65:9–69:17. The facts in paragraph 59 that relate to Nash and Kumar's recollection of the incident are therefore admitted.

[27] Defendant successfully disputes the part of paragraph 29 that asserts that Miller does not agree with Nash's account of what occurred. [42] ¶ 29. Miller testified that she did not remember the incident, [38-2] at 62:18–24; 63:3–8, therefore she can't have an opinion about the truth of Nash's account or Kumar's account. Paragraph 29 is stricken to the extent it asserts that Miller has an opinion on the truth of any person's account of the January 17, 2020 incident.

[28] Plaintiff disputes paragraph 61 on the basis that Miller did not remember the incident when asked about it at her deposition. [36] ¶ 61. The facts in paragraph 61, however, are about Nash's recollection of the incident and his email to HR about the incident. Nash provides foundation for the email in the cited portion of the deposition testimony. *See* [27-2] at 65:22–66:7 (Nash identifying the email as something he wrote). The facts of paragraph 61 are supported by the record and are deemed admitted.

went to Nash and said something like, "Hey why does she talk to me like that. She doesn't even talk to me. Now she talks like I'm her servant." [27-1] at 217:5–8. Nash recalled that Kumar stopped him and "became very argumentative" and using "rapid speech" said things like "where am I supposed to talk?" and "why aren't people complaining about others being loud?" [36] ¶ 61; [27-13]. Kumar admitted that he used a stern voice in his conversation with Nash. [36] ¶ 60. Nash and Kumar agree that Kumar then spoke to the new CIO about how Miller treated him. [36] ¶ 61; [27-1] at 217:9–13. Nash wrote up his recollection of the event and sent it in an email to Murphy, the head of HR. [36] ¶ 61; [27-13].

Nash's final issue with Kumar's behavior were allegations that he had been spreading rumors that Miller would be fired. [36] ¶ 62.[29] The head of QA reported to Murphy and Nash that he heard from other employees that Kumar was saying that Miller would be fired. [36] ¶ 62; [42] ¶ 22. Murphy did not ask Kumar about the allegations and simply relied on what Nash and the head of QA told him. [42] ¶ 22[30]; [38-5] at 37:15–38:15; 39:6–11. Murphy had ongoing conversations with Nash about Kumar's behavior. [36] ¶ 65.

---

[29] Plaintiff disputes paragraph 62 on the basis that Murphy never investigated the rumors. [36] ¶ 62. That is an additional material fact that should have been included in Plaintiff's Rule 56.1 Statement of Additional Facts. *See* N.D. Ill. Local R. 56.1(b)(3), (e)(2). The fact that Murphy didn't investigate the rumors does not directly contradict the asserted fact that Murphy and Nash heard that Kumar was spreading rumors about Miller's firing. Paragraph 62 is deemed admitted.

[30] Defendant partially disputes paragraph 22 of plaintiff's Rule 56.1 Statement of Additional Facts on the basis that the record does not support the assertions that the rumors were not investigated. Murphy testified that the human resources did not do any investigation into the alleged threats and conspiracy theories and plaintiff cited to that portion of the deposition transcript. *See* [38-5] at 39:6–11 ("Q: Did the human resource department do any investigation into these alleged threats and conspiracy theories? [objection to form] A: No.").

On January 29, 2020, Nash wrote an email to Murphy, Miller, Ogunkeye, and other management personnel recommending that Kumar be fired for "insubordinate behavior" and "spreading malicious rumors about a senior member of our team." [36] ¶ 63; [42] ¶ 31.[31] Nash wrote that Kumar had kept other employees occupied with his "conspiracy theories," which he later testified referred to Kumar's "obsession" with who would become the CIO. [36] ¶¶ 63–64.[32] Nash concluded that he did not think Kumar would change his behavior because Kumar had not been responsive to "situational coaching" and had just argued with Nash when he offered feedback. [36] ¶ 63. Murphy approved Nash's recommendation to terminate Kumar. [36] ¶ 66.[33] Murphy testified that Kumar was terminated because he was "verbally abusive to colleagues, particularly younger female colleagues[,] [h]e was very difficult for others to work with[,] … he was openly critical of the way things were done[,] [and] he was absolutely unresponsive to Mr. Nash's attempts to get him to change his attitude." [36] ¶ 67.[34]

---

[31] Paragraphs 32 and 33 of plaintiff's Rule 56.1 Statement of Additional Facts are stricken as unsupported by the record citation.

[32] Plaintiff disputes paragraph 64 on the basis that Defendant offers no evidence of "conspiracy theories." [36] ¶ 64. In the portion of Nash's deposition testimony cited by defendant, however, Nash clarifies that "conspiracy theories" referred to Kumar's "speculation about who would be hired as CIO. [27-2] at 24:23–25:19.

[33] Plaintiff disputes paragraph 66 on the basis that the final decision to terminate was a "collective" decision that included Miller. [36] ¶ 66. Even if that were true, it does not directly controvert the asserted facts that Nash sent a recommendation of termination and that Murphy approved Nash's recommendation. Paragraph 66 is deemed admitted.

[34] Plaintiff disputes paragraph 67 on the basis that Nash had a different opinion about what accelerated Kumar's termination. [36] ¶ 67. The circumstances that "accelerated" the decision to fire Kumar is different than the list of reasons why he was ultimately fired. As such, Nash's opinion about the reason for the timing of Kumar's termination does not directly controvert paragraph 67 and it is deemed admitted.

The parties disagree on exactly when the final decision to terminate Kumar was made. Murphy, Nash, Miller, a junior HR employee, and outside counsel had a meeting to "determine what a severance package would be … and decide whether this was going to go forward." [42] ¶ 34; [38-2] at 44:12–14. Miller testified that she took part in the meeting, but that she "would say the decision had already been made … by Steve and HR." [38-2] at 45:5–21. Kumar was terminated from his position on January 31, 2020. [42] ¶ 35. Kumar filed a Charge of Discrimination with the Equal Employment Opportunity Commission on February 5, 2020. [36] ¶ 5.

## III.   Analysis

Kumar brings claims under Title VII of the Civil Rights Act and the Illinois Human Rights Act for discrimination based on race and national origin and retaliatory discharge. Discrimination and retaliation claims are analyzed in the same manner under both Title VII and the Illinois Human Rights Act. *See Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022) *citing Zaderaka v. Ill. Human Rights Comm'n*, 131. Ill.2d 172, 178 (1989) (applying Title VII analytical framework to IHRA claims) and *Volling v. Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (applying Title VII analysis to IHRA retaliation claim). Kumar does not rely on the *McDonnell-Douglas* burden-shifting framework of analyzing discrimination claims, so I simply look at all of the evidence in the light most favorable to Kumar and ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex or religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d

20

760, 765 (7th Cir. 2016). For retaliation cases, the proscribed factor is the employee's opposition to or report of the employer's discriminatory behavior. *See* 42 U.S.C. § 2000e-3(a); *Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 959 (7th Cir. 2021).

### A.    Discrimination

Only events or occurrences within the 300 calendar days before Kumar filed his charge of discrimination and retaliation with the EEOC are actionable. *See* 42 U.S.C. § 2000e-5(e)(1) and 775 ILCS §§ 5/7A-102(A)(1), (A-1)(1); *see also Bagwe v. Sedgwick Claims Mgmt. Services, Inc.*, 811 F.3d 866, 886 n. 58 (7th Cir. 2016) (looking at IHRA statute to determine statute of limitations on claims). Kumar filed his charge of discrimination on February 5, 2020, so the only actionable adverse actions are those after April 11, 2019. [36] ¶ 5.

Kumar brings his case on the basis that white employees were treated better than non-white employees, specifically him, and focuses on three areas—the amount of annual raises, failure to be promoted, and general exclusion and mistreatment of developers of color.[35]

---

[35] Defendant attempts to cabin Kumar's discrimination claims *only* to Miller and her actions. *See* [36] ¶ 11. The record shows that Kumar was unhappy generally with how the Council was managed and that while he may have focused on Miller, he had concerns about how management as a whole treated developers of color or of non-American national origin. *See, for example*, [38-12] (complaint of retaliation that mentioned Miller, Nash, head of HR, and head of QA); [38-9] at 7–9 (discussion of Kumar's frustrations with "Business/QA" managers); [27-1] at 244:11–13 (that Nash and head of QA helped to facilitate discrimination).

1.      *Annual Raises*

The Council gave out annual raises to all employees. [36] ¶¶ 12–13. Kumar argues that the salary increases were distributed in a discriminatory manner because he received a smaller percentage raise than white employees. [35] at 4, 11.[36] The evidence in the record is a spreadsheet showing raises for the permanent employees in Nash's department from 2012 to 2019. *See* [28].[37] The January 2020 raise is the only actionable raise and at that time there were four permanent employees in Nash's department. [28]; [36] ¶ 16. Kumar got a 1.50% salary increase. One employee who is a Technical Lead, Asian, and Filipino-American received a 2.00% raise. [36] ¶ 16. The other two employees received a 2.01% raise—one is a Technical Lead and white and of American national origin and the other is a developer at the same level as Kumar who is Asian and of Indian national origin. *Id.*

The two employees who were Technical Leads had different job responsibilities and that is a sufficient, non-discriminatory reason for the difference in the amount of their raises, as defendant argues in its briefs. *See* [25] at 11; [41] at 4; *see also Palmer*

---

[36] Defendant urges me to reject Kumar's argument about the *amount* of raises as a "belated [and prohibited] amendment" to the factual basis of his discrimination claims; it claims Kumar's pay discrimination claim was that he did not receive *any* raises and he now seeks to change it. [41] at 4. But defendant made arguments in its motion for summary judgment about why the difference in *amount* of Kumar's pay raise was minimal and not the result of a discrimination. [25] at 10–11. Defendant was clearly on notice that Kumar's claim of pay discrimination was broad enough to include variance in raise amounts. This is neither a new factual, nor even a new legal argument to defendant, and it is appropriate to consider at summary judgment. *See Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 808–09 (7th Cir. 2014) (allowing new legal argument at summary judgment when it did not offer an "unfair surprise").

[37] Docket entry [28] is unsealed. The salary of employees is not protected by statute, rule, or privilege. *See City of Greenville v. Syngenta Crop Protection, LLC*, 764 F.3d 695, 697 (7th Cir. 2014).

*v. Indiana Univ.*, 31 F.4th 583, 591–92 (7th Cir. 2022) (higher raise is not racial discrimination when white colleague had additional responsibilities and title). The third employee belongs to the exact same protected classes as Kumar, which doesn't support Kumar's claim that it was his race and national origin that accounted for the difference in his raise.[38] *See Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931–32 (7th Cir. 1993) ("A plaintiff cannot establish a prima facie case of racial discrimination by showing that … a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races.") (applying this principle when comparison with other employees is the only evidence of discrimination); *accord Bates v. City of Chicago*, 726 F.3d 951, 953, 955 (7th Cir. 2013) (no evidence of discriminatory motive where supervisor demoted and promoted both Black and non-Black employees). Kumar does not provide any additional proof that the difference in his raise was due to racial or xenophobic animus.

Instead, Kumar argues that Miller's professed explanation for his lower raise—Kumar's performance issues—is pretext. Miller stated that she gave Kumar a lower percentage raise because of his "under-performance," but admitted that she did not remember a specific conversation with Nash about giving Kumar a lower raise based on his performance, as she had testified would be the regular practice for making

[38] In his brief Kumar argues that it is false that the one of the employees who received a 2.01% raise is Asian and of Indian national origin but provides no support for his argument. [35] at 11. Furthermore, Kumar admits to paragraph 16 of defendant's 56.1 statement, which lists the four permanent employees in Nash's department, their raise percentage, and their race and national origin as set out above. [36] ¶ 16.

such a decision. [36] ¶¶ 14, 17; [38-2] at 38:15–39:12. While divergence from protocol is sometimes evidence of discrimination, *see Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012), the evidence here does not show that Miller did not speak with Nash, just that she did not remember the specific conversation. Furthermore, Miller testified she was aware of Nash's concerns about Kumar's behavior at work. *See* [27-3] at 24:17–25:12; [36] ¶ 17. A jury could not conclude from Miller's lack of recall that she was lying about the reason she gave him a smaller percentage raise, what is needed to show pretext. *See Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560–61 (7th Cir. 2007) (honesty is the focus of a pretext inquiry) (finding no pretext when employee fails to provide evidence that unwritten policy given as reason for pay difference was a fabrication). The undisputed evidence supports legitimate, non-discriminatory reasons for the difference in the percentage of raise between Kumar and his white colleague—different job responsibilities and Kumar's behavior issues at work—and there is no evidence of racial or national-origin discrimination as to pay raises.

### 2. Promotions

Kumar also believes that defendant should be held liable for failing to promote him because of his race and national origin. He argues that he was not afforded the opportunity to apply for internal positions because they were never announced or posted; instead people moved up under the guise of a "title change." [35] at 12. The record shows that defendant lacked consistent practices for how employees were promoted—internal positions were not posted and yet employees did change positions with a corresponding increase in pay, whether it was called a "title change" or a

promotion. *See* [27-3] at 29:23–31:11; 40:3–41:20; [38-4] at 49:21–50:17. But Kumar cannot show a position into which he should or could have been promoted and therefore he cannot show that he was personally discriminated against. *See Jones v. City of Springfield, Ill.*, 554 F.3d 669, 672–73 (7th Cir. 2000); *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1006 (7th Cir. 2000). The promotions about which there is evidence in the record are promotions to Technical Lead, Manager to Director of Data Analytics, Directors to Senior Directors, and promotions in the project management team. [36] ¶¶ 22, 24, 32; [27-3] at 29:18–31:14.

The most probable move for Kumar would have been to become a Technical Lead, the next most senior position available to developers. [36] ¶ 23. There were three software products that required a Technical Lead and those three positions were filled in 2016, outside the actionable period of time for this case. *See* [36] ¶¶ 24–25. Kumar did not pursue a project management position, which requires different skills and expertise. [36] ¶¶ 28–29. Finally, Kumar does not dispute that there was no need for a Director in his group because Nash was either Director or Senior Director for his entire tenure. [36] ¶ 31. Kumar does not show that there was a position in 2019 or 2020 for which he would have been an eligible candidate, no matter whether he knew of the position or not. This is not to say that the practice of using "title changes" to effect promotions is not problematic as it may be used as a cover for discriminatory animus. But there is no evidence of such animus here and courts do not sit as "super-personnel departments" deciding the wisdom of any employment practice. *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022).

25

3.    *Other discriminatory behavior*[39]

Kumar's other argument is that he and other non-white developers were denied credit for their work, discouraged from going to the town-hall meetings, and disallowed from working from home and this pattern of exclusion harmed Kumar's long-term career prospects and subjected him to working conditions that were "humiliating" and "degrading." [35] at 13 *citing Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). None of the actions of which Kumar complains are the type of adverse employment action that can serve as the basis for a Title VII disparate treatment claim because they are not related to either (a) the financial terms of employment, (b) opportunities to use skills and enhance career prospects, or (c) unbearable working conditions. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014).

An employer's deliberate denial of career opportunities can be an adverse employment action, but the plaintiff must show specific evidence of how the employer's actions harmed his career. *See Patt v. Family Health Sys., Inc.*, 280 F.3d

---

[39] Kumar also argues that his complaints of discrimination were not properly investigated and that Ogunkeye kept putting him off by promising to address the issues with the new CIO. [35] at 9–10.  An employer's failure to investigate complaints of discrimination is not necessarily the basis for a Title VII claim. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2nd Cir. 2010) ("[I]n a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation."); *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 640 (10th Cir. 2012); *see also Tubbs v. Chicago Transit Authority*, No. 20-00693, 2021 WL 1192676 at *5 (N.D. Ill. March 20, 2021). Neither is it necessarily evidence of the discrimination itself. In this case it was Ogunkeye who knew of and "did nothing" about Kumar's complaints. But there is no factual connection between Ogunkeye and any of the employment actions on which Kumar bases his claims. There is no evidence that Ogunkeye was directly responsible for Kumar's raises, the lack of internal job postings, or setting rules about working from home. Finally, there is no evidence that Ogunkeye was involved with Kumar's termination.

749, 753 (7th Cir. 2002). Kumar says that being properly credited for his work could have helped him get a promotion, but he never provides support for that assertion. *See* [36] ¶ 39. A bare assertion, without more, is insufficient to create an issue of material fact at summary judgment. *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 734 n.2 (7th Cir. 2011), *overruled in unrelated part by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Kumar does not complain that he was not allowed to use software development skills at all or even that he did not have the opportunity to improve his skills while at the Council.

The case on which Kumar relies to support his claim that his working conditions were "unbearable," *Alamo v. Bliss*, involved a firefighter who was called racially derogatory names, physically assaulted by his colleagues, and given comparatively more assignments at different locations; he had to take medical leave to deal with the anxiety and stress of his workplace and then had incredible difficulty returning to work and went months without being paid. *See Alamo*, 864 F.3d at 545–48. The plaintiff had shown proof of a hostile work environment, and given that context, the excessive assignments at different locations and his inability to get cleared to return to work were adverse employment actions under Title VII. *Id.* at 552–53. Kumar does not show that his day-to-day working conditions were as difficult as in *Alamo*. There is evidence in the record that all the developers were told that a better use of their time was to do work instead of attending the townhall meetings. [27-1] at 114:11–22. Kumar gives one example of asking to work from home and being told he should take the day off instead. [38-1] at 54:2–12; [27-15] at 8. Neither of these

27

instances, or even the two put together, rise to the level of the kind of degrading treatment necessary to incur liability under Title VII or the IHRA. Finally, when there is no set work-from-home policy and it is up to a supervisor's discretion, denial of that discretionary benefit is not a *per se* adverse employment action. *See Tarpley v. City Colleges of Chicago*, 752. Fed. App'x. 336, 347–48) (7th Cir. 2018) (plaintiff failed to prove a significant negative alteration in her work conditions when there was no work-from-home policy and supervisor wanted her at work to provide on-campus IT support).[40]

Kumar has not provided evidence that being discouraged from attending town-hall meetings, not being properly credited for his work, or not being allowed to work from home affected the financial terms of his employment, harmed his future career prospects, or constituted "unbearable" working conditions. His complaints are not about employment actions that can be the basis of Title VII liability.

## B. Retaliation

Kumar believes that he was fired due to his complaints of racial and national-origin discrimination. To succeed on Title VII and IHRA retaliation claims, a plaintiff must show that his protected activity was "*the* but-for cause" of the adverse employment action. *Mollett v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019)

---

[40] If Kumar believes that the work-from-home policy was enforced in a racially discriminatory manner, demonstrating the Council's racial animus, he has not provided sufficient evidence of that discriminatory enforcement. Kumar lists many examples of white employees being allowed to work from home, but only gives one example of when he was not allowed to work from home in July 2019. *See* [27-15] at 3, 16; [38-1] at 54:2–12. Defendant proffers uncontroverted evidence that Kumar was allowed to work from home in November 2019. [36] ¶ 34; [27-9] at 2. The evidence in the record is inadequate to support a finding of racial or xenophobic bias.

(emphasis in original). Defendant states that Kumar was fired due to his supervisor's belief that Kumar's behavior at work was unacceptable and was not going to improve. [36] ¶ 63. The question is whether a jury could find that Kumar would have been fired if he had not made complaints to Ogunkeye about racial and national-origin discrimination. *See Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 918 (7th Cir. 2022).

Kumar points to one major fact to support his retaliation claim—that his at-work behavior was not an issue before he made his complaints to Ogunkeye. Kumar is correct that in his 2018 review, completed on September 28, 2018, Nash rated Kumar as met or exceeded expectations and gave Kumar positive written feedback. [42] ¶¶ 25–26; [38-8]. Kumar's 2019 review, on the other hand, contained significant negative feedback. [36] ¶¶ 41–51; [27-11]. Considering the record in the light most favorable to the non-movant, Kumar made his first complaint of discrimination to Ogunkeye in June 2019 and followed up with a written complaint that clearly included charges of racial and national-origin discrimination in September 2019. [42] ¶¶ 1, 4. It is true then, that before Kumar made his complaints, his review was very positive, and after he made his complaints, his review became more critical. But that does not necessarily mean that his complaints were the reason for his critical review or his termination, because timing alone is usually insufficient to show proof of causation. *Igasaki*, 988 F.3d at 959–60 (7th Cir. 2021).

There is a break in the chain between Kumar's complaints and the change in his performance reviews—Kumar made his complaints to Ogunkeye, but Ogunkeye did not participate in Kumar's performance reviews. Nash completed the review and

he spoke to Miller about its contents. [36] ¶¶ 41–51; [27-3] at 24:17–25:12. Nothing in the record shows that either of them knew Kumar had made complaints of racial and national-origin discrimination to Ogunkeye. [36] ¶¶ 78–79. "Knowledge of the protected activity is necessary to show causation for a retaliation claim." *Lesiv*, 39 F.4th at 915–916. Because neither Nash nor Miller knew of Kumar's complaints of racial and national origin discrimination, those complaints could not be the reason they gave Kumar a negative performance review. Nor could they give him the negative review to build a case for a retaliatory termination—they did not know he had complained of racial and national-origin discrimination.

Finally, Kumar admits to the problematic behavior that Nash relied on in his email suggesting that Kumar be fired and that Murphy relied on when approving the termination. Kumar does not contest that he spoke with his colleagues in a manner that could be construed as "talking down to them." *See* [38-1] at 174:18–23. He does not dispute that he discussed the identity of the new CIO with his colleagues and that his colleagues may have tired of the topic and complained to Nash about it. [36] ¶¶ 45–46. Kumar admitted to speaking negatively about people in the business and QA side of the Council. [27-11] at 8. Finally, Kumar agrees that even after he and Nash met to discuss the review and his conduct at work, he did not change his behavior. [36] ¶ 58. This uncontroverted record of negative behavior (with no other evidence to suggest this misconduct was not genuinely believed to be employee misconduct) means that Kumar has not shown the cited reason for his termination—his behavior at work—is not the real reason the Council fired him.

30

Kumar argues that the decision to fire him was a "collective" decision made by Nash, Murphy, and Miller and this means that the termination was an act of retaliation against Kumar. [35] at 11. Assuming that the decision to fire Kumar *was* a collective decision, there is no logical bridge between that fact and the conclusion that he was fired in retaliation for making complaints of discrimination. Whether Nash and Murphy made the decision to fire Kumar or Nash, Murphy *and* Miller made the decision, Kumar has not shown that they are lying about the reason they fired him—his inappropriate behavior at work and their belief that it would not improve.

## IV.    Conclusion

Defendant's motion for summary judgment, [24], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: January 3, 2023